[Civ. No. 10934. First Appellate District, Division Two.—April 18, 1939.]

THE CITY OF LOS ANGELES (a Municipal Corporation) et al., Plaintiffs and Appellants, v. CITY OF HUNTINGTON PARK (a Municipal Corporation), Defendant and Respondent; T. R. HOUSEHOLDER, Intervener and Respondent.

THE CITY OF LOS ANGELES (a Municipal Corporation) et al., Appellants, v. THE CITY OF SOUTH GATE (a Municipal Corporation) et al., Respondents.

[Civ. No. 10935. First Appellate District, Division Two.—April 18, 1939.]

THE CITY OF LOS ANGELES (a Municipal Corporation) et al., Respondents, v. THE CITY OF HUNTINGTON PARK (a Municipal Corporation), Appellant.

THE CITY OF LOS ANGELES (a Municipal Corporation) et al., Respondents, v. THE CITY OF SOUTH GATE (a Municipal Corporation), Appellant.

Ray L. Chesebro, City Attorney, S. B. Robinson, Chief Assistant City Attorney, James M. Stevens, Assistant City Attorney, G. Ellsworth Meyer, Deputy City Attorney, and T. B. Cosgrove for Plaintiffs and Appellants.

Clyde Woodworth, City Attorney (City of South Gate), Delbert A. Hessick, City Attorney (City of Huntington Park), Chris J. Griffin, City Attorney (City of Huntington Park), Dunlap & Larwill, Cruickshank, Brooke & Dunlap, Robert H. Dunlap and George R. Larwill for Defendants and Appellants.

Haight, Trippet and Syvertson for Intervener and Respondent.

G. L. Aynesworth, Meserve, Mumper, Hughes & Robertson and Baldwin Robertson, as *Amici Curiae,* on Behalf of Respondents.

SPENCE, J.—Two actions were instituted by plaintiffs City of Los Angeles and the Board of Water and Power Commissioners of that city. In one of said actions the City of Huntington Park was the defendant and in the other, the City of South Gate was the defendant. The plaintiffs sought by said actions to have the court determine the terms and conditions under which they might exercise the right, claimed by them under Statutes 1923, chapter 76, to erect

and maintain electric power transmission lines through the defendant cities. The two actions were consolidated for trial and resulted in a judgment in favor of the plaintiffs affirming the right claimed by plaintiffs and imposing various terms and conditions upon the exercise of said right. Two separate appeals were taken from said judgment. Defendants appealed from the entire judgment while plaintiffs appealed from certain portions thereof. Both appeals will be considered herein.

During 1923 and 1924, plaintiffs developed a plan to bring electric power from Boulder Dam to the metropolitan area of Los Angeles by means of a transmission line supported on steel towers. This plan contemplated the bringing of power at 275,000 volts across the easterly boundary line of the City of Los Angeles to a central receiving station, designated as station B, located at 95th and Central Avenues near said easterly boundary line. It further contemplated that the voltage would be stepped down from 275,000 volts to 132,000 volts at said station B and would then be transmitted to other stations within the City of Los Angeles as follows: station A to the northeast; station C to the south and station D to the west. The map shows that the easterly boundary line of the City of Los Angeles is very irregular in shape and that there are several jogs to the east as said line runs in a northerly direction above said station B. Along said easterly boundary line and either contiguous or practically contiguous thereto are located in order from south to north, beginning at a point near said station B, the cities of South Gate, Huntington Park and Vernon. Plaintiffs' plan was to construct the main line from Boulder Dam to Los Angeles in a westerly direction across the City of South Gate and to construct the loop line from station B to station A in an easterly direction along the same route into the City of South Gate and then in a northerly direction through South Gate, Huntington Park and Vernon and along the banks of the Los Angeles River to station A at Main and Power Streets in the City of Los Angeles. Pursuant to said plan, the plaintiffs purchased and acquired the title in fee to a strip of land approximately 100 feet in width along the entire course of the proposed route through said cities and expended in excess of $2,000,000 for said purpose. Said strip of land, which plaintiffs term the ''right of way'',

was adjacent to the streets of said cities at practically all points. For the sake of convenience, we will hereinafter refer to said strip as the "right of way". After acquiring said right of way, plaintiffs requested the defendant cities to agree upon the terms and conditions upon which plaintiffs might construct and maintain said transmission lines across and over the various streets which were intersected by said right of way. The parties were unable to agree and these actions were commenced in 1926.

It is apparent from the briefs that the main controversy between the parties concerned the question of whether plaintiffs should be permitted to construct and maintain overhead transmission lines as planned by plaintiffs or should be required to transmit the power by means of underground cables. The testimony regarding the practicability of carrying the power underground and the findings of the trial court with respect thereto will be hereinafter discussed. Suffice it to state at this point that, after plaintiffs had proceeded with the development of their plan by surveying the route and purchasing their right of way, the defendant cities enacted numerous power line ordinances and zoning ordinances, many of which would have had the effect, if held to apply, of preventing plaintiffs from erecting an overhead transmission line as proposed.

The complaints filed in the two cases were quite similar. It was alleged therein that plaintiffs had acquired the right of way for their proposed electric transmission lines, describing in detail the portions of the streets in said defendant cities which they desired to cross; that defendants had been requested to agree upon the terms and conditions of the use of the streets of the defendant cities; that the defendant cities had failed to agree with plaintiffs upon said terms and conditions and that more than three months had elapsed since plaintiffs' request had been made. Plaintiffs therefore prayed for judgment determining the terms and conditions of such use.

In the South Gate case, the defendant interposed a demurrer which was sustained without leave to amend. On appeal, the judgment, entered upon the sustaining of said demurrer, was reversed. (*City of Los Angeles* v. *City of South Gate*, 108 Cal. App. 398 [291 Pac. 654].) Answers were filed in both cases by the respective defendants. Among the main

defenses set up in said answers were the power line and zoning ordinances of the defendant cities and the claim that the construction of said transmission lines would result in a decrease of property values. In addition, T. R. Householder, one of the owners of land adjacent to the right of way, filed a complaint in intervention seeking the determination of the amount of damage caused to his property by the construction of the transmission line. The actions were consolidated on motion of plaintiffs and proceeded to trial. The trial was a lengthy one and a large amount of expert testimony was introduced. During the trial, the trial court, on several occasions, inspected the proposed routes and the prevailing conditions in the vicinity. Thereafter the trial court announced its conclusions as the basis for the preparation of the findings of fact, conclusions of law and the judgment. Defendants then petitioned the Supreme Court for a writ of prohibition. Said petition was denied. A second application of defendants for a writ of prohibition was also denied. Judgment was entered on June 15, 1936. After the filing of the notices of appeal, defendants petitioned the Supreme Court for a writ in aid of appellate jurisdiction and the petition was denied. (*City of South Gate* v. *City of Los Angeles*, 6 Cal. (2d) 593 [58 Pac. (2d) 1288].) A similar petition was thereafter denied by the District Court of Appeal.

The trial court found that all the material allegations of the complaints were true and made further findings with respect to the proposed plan and route, the nature of the proposed transmission line, the terms and conditions under which it might be constructed and maintained, including certain terms and conditions relating to the damage which would be suffered by the property owners whose property was located in the vicinity of the right of way. The trial court further found that each of the ordinances of the defendant was either inapplicable or invalid as to plaintiffs.

Some of the more important findings for the purposes of this discussion will be summarized. It was found that plaintiffs had developed their plan and had purchased their right of way through the defendant cities in reliance upon and in acceptance of the grant contained in Statutes 1923, chapter 76; that they had expended large sums of money on the project and had irrevocably committed themselves to the

expenditure of further large sums of money; that at the time of acquiring said right of way, there were no ordinances in existence in the defendant cities purporting to prohibit such use of the properties acquired by plaintiffs; that prior to the filing of these actions, plaintiffs had constructed portions of their proposed transmission lines outside of but extending to the limits of the defendant cities. The trial court further found that the proposed unified plan for the development of the system, was "the only reasonable, practicable and feasible method for the efficient and reliable service of electrical energy to said city"; that said plan, including the proposed type of overhead construction to be built through the defendant cities, was in complete accord with the best known engineering practice and in compliance with all rules and safety regulations of the Railroad Commission; that the proposed type of construction affords security for life and property and will interfere as little as possible with traffic conditions and other existing street uses; that the selection of the routes was made "in a manner most compatible with the greatest public good and the least private injury"; that said routes along said rights of way and across the intersecting streets were the "most practicable, feasible and reasonable routes available"; that in order to afford security for life and property and to interfere as little as possible with existing use of the streets, it was "necessary, in the use of streets and highways for transmission lines such as those proposed and involved herein, that such lines be constructed overhead"; that underground construction of said lines would be "impracticable . . . for the reason that the use of underground cables for high voltage transmission lines . . . has not thus far developed to a sufficient extent that they may be said to be beyond the experimental stage"; that there were no underground cables in use in the United States of sufficient carrying capacity to carry the energy required to be transmitted over the Boulder Canyon line; that at the time of the trial, the only underground cables in the United States of a capacity sufficient to carry even 132,000 volts were in the cities of New York and Chicago and said cables were constructed subsequent to the filing of these actions; that the test made had been insufficient to justify the use of underground cables for the proposed lines under the operating conditions along the

proposed routes; that the underground cables above mentioned were laid in territory with favorable soil conditions whereas the soil conditions within the defendant cities is unfavorable for that purpose; that the proposed type of construction "is the only available, feasible and usable type of construction which will afford security for life and property"; and that the suggested underground construction "cannot be successfully used".

The findings with respect to the various ordinances of the defendant cities are very lengthy. It would serve no useful purpose to set forth at length said findings or the various ordinances. Some of said ordinances were held to be inapplicable to intended use of plaintiffs by reason of provisions, express or implied, of the ordinances themselves. Other ordinances were held to be inapplicable to plaintiffs for the reason that, if held to be applicable, said ordinances would be unreasonable, discriminatory, prohibitory, confiscatory and in conflict with the act of the legislature and various constitutional provisions. It was found that said ordinances were adopted in an effort to prevent plaintiffs from exercising their rights under said act and to limit the power of the court in fixing the terms and conditions under which plaintiffs might exercise their rights. As to certain ordinances, it was found that "said ordinances are unreasonable, discriminatory, prohibitory and confiscatory in that they undertake to require underground construction for the proposed lines, which type of construction cannot be successfully used".

The findings with respect to the terms and conditions under which plaintiffs were to be permitted to exercise their rights need not be discussed at this time. We so state as it is apparently conceded by the parties that said terms and conditions other than those relating to the damage sustained by the property owners in the vicinity, were entirely appropriate in the event that plaintiffs were properly accorded the right to run overhead transmission lines through the defendant cities. Plaintiffs' objections to the findings and judgment relating to said damage will be hereinafter discussed.

Plaintiffs filed an "acceptance agreement" and bond, required by the trial court and hereinafter referred to in the discussion of plaintiffs' appeal, and judgment was entered as above indicated. Plaintiffs thereupon completed the project by constructing the Boulder Canyon line through the City

of South Gate and by constructing the loop line between station B and station A, which last mentioned line traversed in part the City of South Gate and the City of Huntington Park.

## Defendants' Appeal.

As above stated, defendants appeal from the entire judgment. Before discussing the points raised by defendants, we will first set forth the terms of the act under which these actions were instituted.

Statutes 1923, chapter 76 (p. 147), provided in part as follows: "There is hereby granted to every municipal corporation of the State of California the right to construct, operate and maintain . . . electric power lines, . . . across, along, in, under, over, or upon any road, street, alley, avenue or highway, . . . in such manner as to afford security for life and property; . . . and provided, further, that before any such municipal corporation shall use any street, alley, avenue, or highway within any other municipal corporation, the municipal corporation proposing to use such street, alley, avenue or highway shall request the municipal corporation in which such street, alley, avenue or highway is situated to agree with said municipal corporation proposing to make such use, upon the terms and conditions to which such use shall be subject and the location thereof, and if said two municipal corporations are unable to agree on such terms and conditions and locations within three months thereafter then the municipal corporation proposing to use such street, alley, avenue or highway may bring an action in the superior court of the county in which the same is situated against such other municipal corporation to have such terms and conditions and location determined. . . ."

The legislative grant contained in said act is in general terms and the act contains no provision providing for the formal acceptance of the grant. A somewhat similar act was before the court in *City of Beverly Hills* v. *City of Los Angeles,* 175 Cal. 311 [165 Pac. 924]. There the city of Los Angeles had projected a plan for bringing water to that city and had expended large sums in the development of said plan. It was there held that the acts of said city constituted an acceptance of the grant and that said grant "became effective as completely as though the pipe had been actually laid". On page 314, the court said: "The grant

resulting from defendant's acceptance of the state's offer constituted a contract, the property right in which is protected by the federal Constitution (*Russell* v. *Sebastian,* (233 U. S. 195 [34 Sup. Ct. 517, 58 L. Ed. 912, Ann. Cas. 1914A, 152]), *supra,* and the cases therein cited), and the extent of which right is measured by the purpose for which the grant was made and accepted. . . . Assuming, in the absence of the accepted legislative grant, that defendant had obtained from the City of Beverly Hills the right to use its streets for a pipeline, clearly it could not, after a part of such line had been installed, revoke the grant or add thereto new conditions and restrictions the effect of which might nullify and render the grant made wholly inoperative. (Dillon's Municipal Corporations, 5th ed., sec. 1242.) And yet that is the effect of appellant's contention.''

The act under which these actions were instituted differs only in that its provisions are broader and in that resort to a superior court action is provided in the event that the cities involved are unable to agree upon terms and conditions. Said act was before the court on the former appeal in the action brought against the City of South Gate, on which appeal the last-named city challenged the sufficiency of plaintiffs' complaint. (*City of Los Angeles* v. *City of South Gate,* 108 Cal. App. 398 [291 Pac. 654].) The burden of the attack was that the act was unconstitutional on the ground that it conferred legislative powers upon the superior court. The act was there held to be constitutional and the complaint was held to be sufficient. On page 401, the court said: ''There can be no doubt but that the legislature in this instance conferred upon appellant municipality (assuming the constitutionality of the statute) the right to erect and maintain the proposed electric transmission line.'' The court held that the legislature had the power to grant the franchise and that the terms and conditions upon which the grant could be exercised were proper subjects of agreement between the municipalities or of judicial determination. It further held that it was immaterial whether notice of the desire to use the streets constituted an acceptance of the grant or whether the acceptance remained incomplete until the final location was determined upon as ''The appellant is clothed with a right and has done everything within its power to

evidence its selection of particular streets for the purpose of exercising that right.''

■ Defendants contend that the trial court was without jurisdiction as ''no proper opportunity to agree upon the terms and conditions of the proposed use . . . was ever afforded the defendant cities''. We find no merit in this contention. Defendants appear to be foreclosed from raising this question because of the state of the pleadings. In each complaint it was alleged that the defendant city was duly requested to agree upon such terms and conditions; that more than three months elapsed thereafter and the defendant city failed and neglected to agree upon said terms and conditions. These allegations were admitted by the answers of the defendant cities and said allegations appear to meet all the requirements of the act. No evidence was therefore required to prove said issues and no findings thereon were required. (*Welch* v. *Alcott*, 185 Cal. 731 [198 Pac. 626].)

■ Findings were made, however, but owing to the admissions of the pleadings, the sufficiency of the evidence to support said findings cannot now be questioned. (*Muraco* v. *Don*, 79 Cal. App. 738 [250 Pac. 1109].) Defendants argue that plaintiffs did introduce evidence on said issues during the trial and since no objection was made, the issues were raised during the trial. The rule which defendants have in mind is properly applied where the issues are not raised or are defectively raised in the pleadings but it has no application where the facts are aptly pleaded in the complaint and are admitted by the answers, either expressly or by failure to deny.

■ But aside from the admissions of the pleadings, we believe that the evidence was sufficient to measure up to the requirements of the act. It appears therefrom that plaintiffs requested that the defendant cities agree upon the terms and conditions of the proposed use and submitted proposed forms of agreements to be entered into; that representatives of plaintiffs appeared before the proper authorities of the defendant cities to discuss the proposed use; that the attitude of the defendant cities was at all times one of refusing to consider an agreement to the proposed use by plaintiffs and of insisting upon a use which plaintiffs considered, and the trial court found, impracticable and unsound. During the trial, it was stipulated that ''Huntington Park and South

Gate had never been able to agree with Los Angeles as to the terms, conditions and location of a tower line''. The act in question merely contemplates that a request to agree upon the terms and conditions of the proposed use should be made and that the municipality in which the proposed use is to occur should thereafter have an opportunity, during the prescribed three months' period which follows, to negotiate upon the terms and conditions of the proposed use. Such request was made and such opportunity was afforded to the defendant cities in the present case. In view of the admitted fact that the parties were unable to agree, within the time prescribed, plaintiffs were entitled to invoke the provisions of the statute permitting the filing of an action to have such terms and conditions determined.

Certain further contentions of defendants involve attacks upon the findings and conclusions of the trial court with respect to the invalidity and inapplicability of the ordinances of the defendant cities. Closely related to these contentions are certain contentions of defendants with respect to the nature of rights acquired by plaintiffs by virtue of their acceptance of the legislative grant.

The act grants to a municipality the right to construct, operate and maintain electric power lines ''across, along, in, under, over, or upon any road, street, alley, avenue or highway''. When the right is exercised by one municipality within the boundary lines of another municipality, it must be exercised upon terms and conditions agreed upon by said municipalities or determined upon by the court as provided in the act. If we understand the contentions of defendants, they take the position that the only right which could be acquired by plaintiffs by virtue of their acceptance of the grant was a right to construct electric power lines along, in, under or upon the streets of the defendant cities and within the boundary lines thereof. We believe that defendants' conception of the right which plaintiffs acquired by virtue of the acceptance of the grant is too limited. Plaintiffs' right is to be measured ''by the purpose for which the grant was made and accepted''. (*City of Beverly Hills* v. *City of Los Angeles, supra,* p. 314). If the grant was made for such a purpose as that embraced in plaintiffs' plan, it appears certain that plaintiffs did everything within their power to accept the grant for that purpose. As we view the

act, one of its main purposes was to grant to one municipality the right to enter another for the purpose of constructing and maintaining power lines. It is a matter of common knowledge that the ordinary purpose for which such lines are constructed is to bring electricity at high voltages from the source of supply into the municipality constructing said lines and that such lines are ordinarily suspended from towers which cannot be constructed within the boundary lines of a street. The trial court found upon sufficient evidence that plaintiffs' plan embraced the only reasonable, feasible and practicable means of transmitting electricity at the required voltages through the defendant cities. It will be noted that the statute provides for the construction and maintenance of electric power lines not only along, in, under or upon streets but also *across* and *over* streets. We are of the opinion that the act contemplated among other things the construction and maintenance of such lines upon private rights of way as planned by plaintiff notwithstanding the fact that said act expressly dealt only with the use of streets. The acquisition of such private rights of way, at all points other than streets, was necessarily left to the ordinary processes of purchase or condemnation. ▇ When plaintiffs formulated their plan and accepted the alleged grant for the purposes of developing their plan, we believe that the purpose of their acceptance was within the purpose of the grant and that their right is to be measured accordingly.

▇ Turning to the power line and zoning ordinances adopted by the cities, it is certain that some of said ordinances were intended to prohibit and by their terms did purport to prohibit the construction of transmission lines such as were embraced in plaintiffs' plan. It is defendants' contention that the trial court erred in its findings and conclusions with respect to said ordinances and that said ordinances should have been held valid and applicable to plaintiffs. Much of defendants' brief is devoted to the argument that the construction and maintenance of electric transmission lines are the proper subjects of regulation by a city in the exercise of its police power; that police power has been conferred upon the defendant cities by the Constitution; and that the act in question did not prevent the enactment of regulations on those subjects by the defendant

cities in the proper exercise of such police power. As we understand plaintiffs, they do not question the right of the defendant cities to enact reasonable regulations upon the subjects in question, but they contend that said ordinances were unreasonable and confiscatory and therefore void as to plaintiffs.

It may be conceded, as claimed by defendants, that the legislative act did not purport to cover the entire field and that the defendant cities had the right to enact reasonable regulations. This may have been implied in the opinion on the former appeal in the South Gate case (*City of Los Angeles* v. *City of South Gate, supra*) where the court said at page 402, "If it (South Gate) refuses because it claims the right to legislate reasonable terms and conditions to which the use shall be subject, its rights and limitations in this particular are the proper subject of judicial inquiry". We believe, however, that the question is fundamentally that of the reasonableness of the ordinances viewed in the light of the grant found in the legislative act and the acceptance thereof by plaintiffs. The basic right of plaintiffs rested upon said grant and their acceptance thereof even though the terms and conditions were subject to determination by agreement or by judicial decree. The trial court has found in substance that if these ordinances are applicable, they will have the effect of preventing the exercise of the right acquired by plaintiffs by the acceptance of said grant. Said findings are amply supported by the evidence and we find no error in the trial court's findings with respect to the ordinances of the defendant cities. Defendants cite and rely upon *Sunny Slope Water Co.* v. *City of Pasadena,* 1 Cal. (2d) 87 [33 Pac. (2d) 672], and *City of South Pasadena* v. *City of San Gabriel,* 134 Cal. App. 403 [25 Pac. (2d) 516]. These cases are distinguishable in that no legislative grant was involved in any of said cases. Other cases cited in defendants' briefs are distinguishable upon the ground that the regulations were reasonable and did not have the effect of preventing the exercise of the right acquired.

Defendants further contend that "the statute has been repealed and the action should abate". We find no merit in this contention. The 1923 act has not been repealed. It was amended in 1927 (Stats. 1927, p. 1211) and again in 1933 (Stats. 1933, p. 2576). By the 1927 amend-

ment, the provisions for a superior court action were deleted but such provisions were restored by the 1933 amendment. In section 2 of the amendment of 1927, it was provided, "This act shall not affect any right or action which has accrued, or any duty imposed, or any proceedings commenced under and by virtue of the act hereby amended". The 1933 amendment contained a similar saving clause. ■ Under this same heading, defendants apparently claim that trial court erred in permitting an amendment in 1932 to plaintiff's complaint in the South Gate case. No showing of prejudice has been made and we find no abuse of discretion in the allowance of said amendment.

■ Defendants further contend that the act under which these proceedings were instituted is unconstitutional. They argue that said act is unconstitutional as violative of article IV, section 24, article I, section 14, article IV, section 31, article XI, section 12 and article XI, section 11 of the Constitution. The constitutionality of the act was under consideration in the former appeal in the South Gate case. It was there sustained against the attacks then made upon it. We have considered the arguments of defendants with respect to the sections of the Constitution above mentioned and are of the opinion that said act is not violative of any of said sections.

■ Defendants also contend that plaintiffs "have waived all rights under this pending proceeding". They devote but one page of their brief to this subject. They point out that the actions were commenced in 1926 and were not tried until 1932. They assert that the lapse of time was such that plaintiffs should not be permitted to assert rights which they have "abandoned". There is no evidence justifying the statement that plaintiffs abandoned any rights and the history of this litigation shows that plaintiffs are not chargeable with any unreasonable delay.

■ Defendant City of Huntington Park contends the trial court erred in consolidating the two actions for trial. This contention appears to be likewise without merit. While these were special proceedings, the act contains no provisions concerning the procedure to be followed by the trial court. We therefore conclude that the trial court had the power, in its discretion, to order a consolidation of the actions (*Coghlan* v. *Alpers,* 140 Cal. 648 [74 Pac. 145]) provided

such consolidation would be "without prejudice to a substantial right". Code of Civil Procedure, section 1048. Said defendant claims that said consolidation was prejudicial to it but the showing made by said defendant appears insufficient to show an abuse of discretion of the trial court in making its determination to the contrary.

Both defendants contend the judgment is void because the findings make reference to exhibits introduced in evidence without making the exhibits a portion of the findings. The findings in question set forth the fact that electrical energy will be available at Boulder Dam for distribution to the cities of Pasadena, Glendale, Burbank and Los Angeles, "pursuant to the terms of contracts with the Secretary of Interior of the United States which were introduced in evidence in these actions". We find no invalidity in the judgment because of the omission of the exhibits from the findings. The rights of the parties, as determined by the judgment, are not dependent in any way upon said contracts with the secretary of the interior. This distinguishes the present case from *Boone* v. *Doyle Cattle Co.*, 132 Cal. App. 355 [22 Pac. (2d) 542], which is cited and relied upon by defendants.

The final contention of defendants is that plaintiffs have acquired no preferential rights by the construction of the transmission lines. We do not understand that plaintiffs claim any preferential rights by reason of the construction of such lines. The parties state that such lines have been constructed since the entry of judgment but the propriety of the trial court's judgment must be determined without regard to what plaintiffs may or may not have done since the entry thereof. Under this heading, defendants make the assertion that plaintiffs "will actually save money by putting the line underground". They refer to testimony indicating that the cost of overhead installation, including land, is $260,000 per mile while the cost of underground installation is $170,000 per mile. They then conclude that "nothing less than a reversal with a direction that the line be put underground will constitute a just result". These facts and figures tend to indicate the correctness of the testimony offered by plaintiffs and of the trial court's findings regarding the impracticability of putting the lines underground. It would be difficult to believe that plaintiffs would have determined upon overhead construction of approxi-

mately nine miles of lines in and about the defendant cities if it had been feasible to put said lines underground at a saving of $90,000 per mile.

### Plaintiffs' Appeal.

Plaintiffs appeal only from that portion of the judgment found in subdivisions 2, 3 and 4 of paragraph "Sixth" and in paragraph "Eighth" thereof. These provisions of the judgment were part of the "terms and conditions" imposed upon plaintiffs by the court. They related to the damage to property in the immediate vicinity to the plaintiffs' proposed transmission line.

The main contention of plaintiffs is that the trial court was without jurisdiction to enter said provisions in the judgment. A consideration of this contention requires further discussion of the act in question.

We have heretofore held that said act constituted a grant in general terms and that the precise terms and conditions under which the grant might be exercised were left to determination by agreement or by the superior court. There are no express provisions in the act purporting to define the nature of the terms and conditions which might be imposed by the superior court in an action brought thereunder. The act has been held to be constitutional and we are of the opinion that the only implied limitation upon the superior court in fixing the terms and conditions is that such terms and conditions should be reasonable in the light of the peculiar facts and circumstances before the court in each particular case. We therefore turn to the facts and circumstances before the court in these actions in order to determine the reasonableness of the terms and conditions imposed.

We have hereinabove summarized certain findings of the trial court. It appears therefrom that the trial court had determined that the plan of plaintiffs embraced the only feasible method of constructing said lines; that the routes selected were the most feasible routes; and that it was necessary that the lines be constructed overhead as underground construction was impracticable and could not be successfully used. It further appears, however, that the trial court was impressed with the fact that the construction and maintenance of tower lines through defendant cities would result in damage to the certain property in the immediate vicinity of such lines and that there would be a resulting decrease

in the value of such property. Allegations to that effect are found in the answers of the defendant cities and also in the complaint in intervention, by which complaint in intervention damages were sought on behalf of the intervening property owner. The trial court took evidence on the subject of damage and inspected the property along the routes traversed by said lines.

During the trial, plaintiffs "waived any and all objections which might be urged against intervention in these actions by owners of property within defendant cities of Huntington Park and South Gate". It appears that "the waiver was for the sole purpose of enabling them to set forth, urge and litigate any and all claims for damages which they may claim have accrued or may in the future accrue to said properties". T. R. Householder was the only property owner who did intervene. In their trial brief, plaintiffs fully recognized the problem presented to the trial court and made certain suggestions under the heading "Solution". They therein stated that the facts and circumstances furnished sufficient foundation for the belief "that the property owners' damage is the crux of the situation and supplies the backbone of the resistance to the enforcement of the statute involved here"; that they could "easily understand that there might exist in the mind of the court the quite natural desire to provide in these actions some adequate protection and assurance for the property owners concerning any legal damages which might arise after construction". Plaintiffs therein suggested by way of a solution of the problem that the court could provide "as one of the conditions in the interlocutory decree a provision that plaintiffs execute a bond in favor of the owners of the properties affected, guaranteeing and securing to them the payment of any damages which they may suffer by reason of the construction of the electric lines". While the trial court went further than the suggestion made by plaintiffs in their trial brief, the foregoing excerpts are quoted to show that plaintiffs there conceded the reasonableness of imposing some terms and conditions with respect to the damage to the property owners.

The trial court found and concluded that there would be damage to property in the immediate vicinity and a resulting decrease in the value thereof; that the claimed inductive

interference with radios and the like would be slight but that a decrease in property values would result in the vicinity of said lines mainly by reason of the unsightliness of the lines suspended on large towers and by reason of the fear which some persons would entertain with respect to said lines. The trial court therefore concluded that notwithstanding the fact that property owners, other than the intervener, had not intervened, it should provide for compensating the property owners in the vicinity for the damage sustained. The trial court then found that, within a certain zone surrounding said lines, the property owners had been damaged and that adequate compensation would be afforded if awards were made to the property owners within that zone based upon varying percentages of the assessed values of the properties as shown on the assessment roll for 1935. The zone was described in the findings and the varying percentages were fixed depending upon whether the property within the zone was abutting or non-abutting property and whether it was improved or unimproved property. It then provided the method for determining the owners of all such property and gave said owners the option of accepting the awards within a specified time after the judgment might become final, in full satisfaction of all claims for damages against plaintiffs. The trial court further provided that before judgment should be entered pursuant to the findings of fact and conclusions of law, plaintiffs, without prejudice to their right on appeal to question the jurisdiction of the court to make provisions relating to such damages, should be required to file an "acceptance agreement" stipulating that the classifications of the property were fair and reasonable, and that if compensation was properly allowable in these actions, that each award was just and reasonable in the amount awarded; and further, that plaintiffs should be required to file a bond in the sum of $225,000 guaranteeing the payment of said awards. It was also provided that unless plaintiffs filed said acceptance agreement and bond within thirty days, that judgment should not be entered on said findings of fact and conclusions of law but that the trial court would reopen the actions for the purpose of permitting the property owners to intervene in order to have their claims for damages adjudicated. The amount of damage suffered by the intervener F. R. Householder, was determined to be the sum of $300.

Pursuant to the foregoing provisions of the findings of fact and conclusions of law, plaintiffs filed the above-mentioned "acceptance agreement" and bond. The judgment carries the foregoing provisions into subdivisions 2, 3 and 4 of paragraph "Sixth" and into paragraph "Eighth" of the judgment, which portions are under attack by plaintiffs on this appeal. The judgment further recited that plaintiffs had filed the "acceptance agreement" and bond in all respects in conformity with the findings of fact and conclusions of law.

In addition to contending that the trial court had no jurisdiction to include such provisions in the judgment, plaintiffs claim that said provisions are void because they are not warranted by the pleadings; they are not in favor of parties to the action; they are in favor of unnamed persons; and they are made optional with the property owners. Many cases are cited by plaintiffs dealing with actions of the ordinary type but none of said cases involved proceedings under an act similar to that before us.

We are of the opinion that the trial court had jurisdiction under the act to impose said terms and conditions relating to damage and that said provisions are not invalid upon any of the grounds urged by plaintiffs. The act is unique in its provisions and when a plaintiff seeks to have the superior court fix the terms and conditions upon which it may exercise its rights acquired under the act, we believe that the trial court has jurisdiction to impose any terms and conditions which the facts and circumstances may show to be reasonable. It will be noted that plaintiffs have not questioned the reasonableness of the awards but, on the contrary, they have stipulated in the "acceptance agreement" that each of said awards is reasonable in amount. It therefore must be taken as an admitted fact that every property owner, included as a beneficiary under said provisions, suffered damage to his property in the amount fixed by reason of the construction of plaintiff's transmission lines. There were hundreds of said owners included in the zone described by the trial court, and under the peculiar facts and circumstances of these cases, we believe that it was entirely reasonable to require that plaintiffs pay the amount of the admitted damage caused by the exercise of said rights.

In a proceeding under said act we do not believe that the issue of damage to property owners need necessarily

be raised by defendants' pleadings in order to warrant the inclusion in the judgment of provisions similar to those under attack. When plaintiffs sought their remedy under the act, asking that the terms and conditions be fixed by the court, plaintiffs themselves necessarily raised the issue as to what terms and conditions should be imposed as a condition precedent to the exercise of the rights claimed by them and any terms and conditions, shown to be reasonable under the evidence, were warranted by the pleadings. ▆▆▆ Furthermore, we believe it immaterial in such proceedings that the acceptance of such awards was made optional with the property owners, who were not named and were not parties to the action. Not being parties to the action, they could not be bound by the judgment and therefore the acceptance of the awards was necessarily made optional with said property owners. There is no uncertainty in the judgment regarding the property involved, the amount of the award in each instance, or the manner provided by the court for determining the person entitled to such award. We again stress the fact that this was not an ordinary action but one in which the trial court was requested by plaintiffs, under the terms of the act, to determine the terms and conditions upon which it might exercise its claimed rights. We conclude that all of the terms and conditions were entirely reasonable under the circumstances.

The judgment is affirmed.

Nourse, P. J., and Sturtevant, J., concurred.